FILED
COURT OF APPEALS
DIVISION II

2015 AUG -4 AM 9: 59

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45965-5-II |
| Respondent and Cross-Appellant, | |
| v. | |
| ERIC S. MORRISSEY, | UNPUBLISHED OPINION |
| Appellant and Cross-Respondent. | |

JOHANSON, C.J. — Eric Morrissey appeals his jury trial conviction for first degree manslaughter and argues that (1) the jury instructions impermissibly lowered the State's burden of proof, (2) insufficient evidence supports his conviction, (3) the jury returned inconsistent verdicts, and (4) the trial court unconstitutionally ordered him to pay fees and costs. We hold that (1) the trial court's jury instructions were proper, (2) sufficient evidence supports Morrissey's convictions, (3) the jury's verdicts were not inconsistent, and (4) Morrissey failed to preserve his challenge to the legal financial obligations (LFOs) imposed for our review. Accordingly, we affirm.

## FACTS

### I. BACKGROUND FACTS

In August 2013, Talon Newman and Michael Hodgson were walking in downtown Shelton when Newman recognized three men in an alley who had assaulted Newman's friend, Jeff Baker,

several months earlier. These three men were later identified as Jacob Rossi, Chris Noor, and Sean Harris.[1] Hodgson testified that Newman ran up to the three men and got into a seconds-long fist fight with Rossi before Rossi ran away. Newman and Hodgson then stopped at a friend's house before going back to Hodgson's apartment.

Rossi testified that Newman was yelling and then ran up to him, started shoving him, and got in his face. Rossi said that Newman punched him a few times, that he attempted to punch Newman back but missed, and that he ran away because he was afraid. After getting separated from his friends, Rossi went to look for Harris and again encountered Newman in the alley. Newman punched him again and Rossi ran to a house where several other friends lived, including Morrissey and Marquis Bullplume.

Rossi's group went to Brandon Lewison's house, where Harris stayed periodically, to look for Harris. They found Harris and decided, with Lewison's and Harris's help, to walk back into town to find their friend Noor. But after walking around for a while and not finding Noor, the group decided to go home.

However, on their way home, the group again encountered Hodgson and Newman. According to Hodgson, Newman approached the group and asked Rossi if he wanted to fight and Rossi declined. Bullplume testified that Newman was aggressive; that he asked Rossi, Harris, and Morrissey if they wanted to fight; that Newman got in Morrissey's face; and that Newman shoved Morrissey and tried to "kind of spit on him." 4 Report of Proceedings (RP) at 674. While Hodgson

---

[1] Jacob Rossi's legal name is Jacob Curtis. However, both parties more frequently refer to him as "Rossi." Sean Harris also goes by and is referred to by the parties as Sean Davis.

was asking Rossi why Newman wanted to fight him, Hodgson saw Newman fall to the ground and saw Morrissey kneel down or bend over and start punching Newman several times.

Rossi and Bullplume testified that they saw Morrissey head butting Newman once before he fell. Rossi also testified that he saw Morrissey punching Newman a "few" times when he was on the ground. 3 RP at 401. Bullplume pulled Morrissey off Newman and they ran back to Morrissey and Bullplume's house. Newman later died in the hospital from his injuries.

Nichole Gallo, an assistant manager at a nearby restaurant, testified that she thought Newman was "motionless" when he fell to the ground after Morrissey had head butted him. 3 RP at 594. Ira Osman, a passerby who also witnessed the altercation, testified that he saw Morrissey's group "swarm[ ]" around Hodgson and Newman. 3 RP at 504.

Bullplume was Morrissey's only witness at trial. Contrary to what Gallo and Hodgson had said, Bullplume testified that Newman was not unconscious after Morrissey head butted him. He only fell "halfway" and he "caught himself and was about to get back up" before Morrissey started punching him. 4 RP at 676.

## II. TRIAL AND OTHER PROCEDURAL FACTS

In January 2014, the State charged Morrissey with second degree felony murder[2]—with second degree assault[3] as the predicate felony—and first degree manslaughter.[4] At trial, the

---

[2] RCW 9A.32.050(1)(b).

[3] RCW 9A.36.021(1)(a).

[4] RCW 9A.32.060.

witnesses testified consistently with the above facts.[5] The State called several other witnesses, including Dr. Richard Harruff, the King County Chief Medical Examiner, who testified that Newman died from blunt force injury to his brain stem and spinal cord. According to Dr. Harruff, Newman's injuries were consistent with the State's theory: that Newman died when Morrissey got on top of him and punched him several times in the face, causing spinal cord injury when the back of Newman's head banged against the pavement.

The trial court gave two jury instructions defining recklessness without objection:

> A person is reckless or acts recklessly when he or she knows of and *disregards a substantial risk that substantial bodily harm may occur* and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

Clerk's Papers (CP) at 106 (emphasis added).

> A person is reckless or acts recklessly when he or she knows of and *disregards a substantial risk that a death may occur* and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.

CP at 114 (emphasis added). Although one of these instructions defining recklessness was meant to apply to second degree assault and the other was meant to apply to first degree manslaughter, the trial court did not specifically instruct the jury on which definition goes with which charge. The "to-convict" instruction for first degree manslaughter states,

> To convict the defendant of the crime of manslaughter in the first degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about August 27, 2013, the defendant engaged in reckless conduct;
> (2) That Talon Newman died as a result of defendant's reckless acts; and

---

[5] The State also presented a surveillance video that does not show any of the actual altercation although it helps to set out the timeline of events.

4

(3) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 116.

The jury convicted Morrissey of first degree manslaughter. Morrissey appeals his conviction and the State cross appeals.[6]

## ANALYSIS

### I. THE JURY INSTRUCTIONS MADE THE APPROPRIATE LEGAL STANDARD MANIFESTLY APPARENT

Morrissey argues that the jury instructions did not make it manifestly apparent to the jury which of two definitions of "recklessness" applied to first degree manslaughter.[7] According to Morrissey, this instructional error allowed the jury to impermissibly convict him based on a finding that Morrissey disregarded a substantial risk of "bodily harm" rather than a substantial risk of "death." We disagree.

### A. STANDARD OF REVIEW AND RULES OF LAW

We review jury instructions de novo. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Read as a whole, the court's instructions to the jury "'must make the relevant legal standard manifestly apparent to the average juror.'" *State v. Kyllo*, 166 Wn.2d 856, 864, 215 P.3d

---

[6] Because we affirm, we do not reach the State's cross appeal.

[7] Morrissey repeatedly argues that the trial court's instructions must make the relevant legal standard "manifestly clear." Br. of Appellant at 7, 9. The appropriate standard, from *State v. Kyllo*, 166 Wn.2d 856, 864, 215 P.3d 177 (2009) (quoting *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)), and other cases is "'manifestly apparent.'" *State v. Marquez*, 131 Wn. App. 566, 575, 127 P.3d 786 (2006).

177 (2009) (quoting *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)). "Jury instructions, taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). Specifically, the "to-convict" instruction "must contain all of the elements of the crime because it serves as a 'yardstick' by which the jury measures the evidence to determine guilt or innocence." *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 142 (2010) (internal quotation marks omitted) (quoting *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)).

Here, the trial court instructed the jury with two different but legally correct definitions of "recklessness." Jury instruction 22 applied to first degree manslaughter and jury instruction 14 applied to second degree assault, the predicate offense for the felony murder charge. The definitions of "recklessness" were based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 10.03, at 209 (3d ed. 2008) (WPIC). Jury instruction 22 read, "A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that *a death* may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation." CP at 114 (emphasis added). Jury instruction 14 read, "A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that *substantial bodily harm* may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation." CP at 106 (emphasis added).

In addition, the first degree manslaughter "to-convict" instruction read,

> To convict the defendant of the crime of manslaughter in the first degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:

> (1) That on or about August 27, 2013, the defendant engaged in reckless conduct;
>
> (2) That Talon *Newman died as a result of defendant's reckless acts*; and
>
> (3) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 116 (emphasis added). The trial court instructed the jury that "[a] person commits the crime of assault in the second degree when he or she intentionally assaults another and thereby recklessly inflicts substantial bodily harm." CP at 109.

The State points to the fact that the instructions pertaining to each charge were grouped together. For example, the recklessness instruction referring to "death," which applies to the first degree manslaughter charge, was jury instruction 22, while the manslaughter "to convict" instruction was jury instruction 24. Likewise, the recklessness instruction referring to "substantial bodily harm," which applies to the second degree assault charge, was jury instruction 14, while the second degree assault definition was jury instruction 17, and the felony murder "to convict" instruction was jury instruction 20. Because we find the reasoning in *State v. Johnson*, 180 Wn.2d 295, 325 P.3d 135 (2014), persuasive, as we discuss below, we need not decide whether grouping the instructions together is alone sufficient to make the legal standard manifestly apparent as the State encourages us to do.

Although we found no case directly on point, our Supreme Court's decision in *Johnson* is persuasive. There, a defendant charged with second degree assault challenged the court's general jury instruction defining recklessness. *Johnson*, 180 Wn.2d at 304-05. The trial court defined "recklessness," stating that a person acts recklessly when "'he or she knows of and disregards a

substantial risk that *a wrongful act* may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.'" *Johnson*, 180 Wn.2d at 305; WPIC 10.03. The trial court also gave a to-convict instruction based on WPIC 35.03, at 456, including a requirement that the jury find that Johnson "'recklessly inflicted substantial bodily harm.'" *Johnson*, 180 Wn.2d at 305 (emphasis omitted). The to-convict instruction in *Johnson* read,

> "To convict the defendant of the crime of assault in the second degree, as charged in count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That during the time intervening between May 4, 2009 and May 6, 2009, the defendant intentionally assaulted [J.J.];
> (2) That the defendant thereby *recklessly inflicted substantial bodily harm* on [J.J.]; and
> (3) That the acts occurred in the State of Washington."

180 Wn.2d at 304-05 (alterations in original).

Johnson argued that the recklessness jury instruction was improper because the trial court failed to remove the general words "a wrongful act" and insert the wrongful act associated with second degree assault, "substantial bodily harm," in its place. *Johnson*, 180 Wn.2d at 304-05. He argued that using the general "wrongful act" phrase lowered the State's burden of proof because it permitted the jury to convict him on the basis of any wrongful act. *Johnson*, 180 Wn.2d at 305. Our Supreme Court disagreed and held that instructing the jury using the general "wrongful act" phrase was not error "because we review instructions as a whole, and here, the 'to convict' instruction accurately expressed the essential elements of the crime." *Johnson*, 180 Wn.2d at 308. Specifically, the court held that

> [t]aken in their entirety, the instructions in this case were sufficient. The "to convict" instruction properly laid out the elements of the crime. It identified the wrongful act contemplated by Johnson as "substantial bodily harm." Separately

8

providing a generic definition of "reckless" did not relieve the State of its burden of proof. The "to convict" instructions are the primary "yardstick" the jury uses to measure culpability, and here they were accurate.

*Johnson*, 180 Wn.2d at 306.

Like in *Johnson*, here, the to-convict instruction for first degree manslaughter is proper and contained all essential elements of that offense. The to-convict instruction, as in *Johnson*, was based on the relevant pattern instruction and identified the appropriate "wrongful act": "Talon Newman died." CP at 116. Unlike *Johnson*, the trial court here gave two proper, charge-specific instructions: one defining "recklessness" for first degree manslaughter and a different instruction defining recklessness for second degree assault. These instructions permitted the jury, when reading the jury instructions as a whole, to match the "wrongful act" identified in the to-convict instruction for first degree manslaughter—"Talon Newman died"—with the "wrongful act" of "death" contemplated by jury instruction 22.

There is no reason to assume that the recklessness instructions would mislead the jurors when the to-convict instruction correctly identified the wrongful act at issue. Reading the instructions as a whole, the fact that the trial court identified the specific wrongful act at issue in its instructions defining recklessness makes it more likely that the jurors matched the correct to-convict instructions with the appropriate recklessness definitions.

Morrissey also argues that because the court did not explicitly instruct the jurors regarding which definition of recklessness they should apply to which crime, the appropriate standard was not manifestly apparent. However, he provides no authority for the proposition that the trial court has a duty to specifically make such an instruction. His argument also ignores the requirement

that we read the jury instructions as a whole. *See Johnson*, 180 Wn.2d at 306; *Kyllo*, 166 Wn.2d at 864. This argument is unpersuasive.

We hold that, read as a whole, the trial court's instructions made the relevant legal standard manifestly apparent because the to-convict instruction in this case was proper, contained all the essential elements of the crime at issue, and both the "to-convict" instruction and the "recklessness" instruction specifically identified the "wrongful act" contemplated by a first degree manslaughter charge.

## II. SUFFICIENT EVIDENCE SUPPORTS MORRISSEY'S MANSLAUGHTER CONVICTION

Morrissey argues that no reasonable jury could have found that he knew of and disregarded a substantial risk of death from the facts the State presented at trial to support his manslaughter conviction. We disagree.

We review a challenge to the sufficiency of the evidence to determine whether, when "'viewed in the light most favorable to the prosecution, [the evidence] permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). A defendant who claims that insufficient evidence supports his conviction admits the truth of the State's evidence as well as any reasonable inferences that may be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact's determinations regarding witness credibility, conflicts in testimony, and the weight given to the evidence. *Thomas*, 150 Wn.2d at 874-75. When evaluating the sufficiency of the evidence, "circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

A person commits first degree manslaughter when he "recklessly causes the death of another person." RCW 9A.32.060(1)(a). A defendant acts "recklessly" when, for the purposes of first degree manslaughter, he "knows of and disregards a substantial risk that [death] may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c); WPIC 10.03.

Here, there is sufficient testimonial evidence from Gallo, Hodgson, and Dr. Harruff to support Morrissey's first degree manslaughter conviction. Gallo saw Newman fall "lifeless" and "motionless" to the ground. 3 RP at 594. After Newman fell, Gallo saw a "gentleman come around to his left side and get on his knees" to continue hitting Newman. 3 RP at 594. Hodgson testified that Newman was "not conscious" when he fell to the ground and identified Morrissey as the person who moved next to Newman's body and kept hitting him. 2 RP at 273.

Dr. Harruff testified that Newman died as a result of damage to his spinal cord caused by "blunt force injury" to the back of his head and neck. 1 RP at 152. He stated further that Newman's head and facial injuries were "consistent with" the State's theory that Morrissey punched Newman on the left side of his face, which caused the right side of the back of Newman's head to strike the pavement, fatally damaging his spinal cord. 1 RP (Jan. 7. 2014) at 178.

Drawing all reasonable inferences in the State's favor, we hold that sufficient evidence exists from which a rational jury could find all the essential elements of first degree manslaughter beyond a reasonable doubt.

### III. Inconsistent Jury Verdicts

Morrissey argues that the jury's inconsistent verdicts violated his due process rights. Specifically, he argues that the jury's verdicts are inconsistent because the guilty verdict on first

11

degree manslaughter required a finding that he disregarded a substantial risk of death; but his acquittal on felony murder with second degree assault as the predicate felony demonstrates that the jury did not find that Morrissey disregarded a substantial risk of bodily harm. We disagree because in *State v. Ng*, 110 Wn.2d 32, 48, 750 P.2d 632 (1988), Washington adopted the *United States v. Powell*, 469 U.S. 57, 64-67, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984), rule holding that "[w]here the jury's verdict is supported by sufficient evidence from which it could rationally find the defendant guilty beyond a reasonable doubt, we will not reverse on grounds that the guilty verdict is inconsistent with an acquittal on another count." Because sufficient evidence supports his first degree manslaughter conviction, as discussed above, we hold that Morrissey's acquittal on felony murder does not establish that an inconsistent jury verdict violated his due process rights.

## IV. MORRISSEY WAIVED HIS LFO ARGUMENT

Morrissey argues for the first time on appeal that the trial court erred in requiring him to pay certain costs and fees without first considering his present or future ability to pay and that this violates his right to counsel. Citing *Fuller v. Oregon*, 417 U.S. 40, 45-46, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974), Morrissey frames this as a constitutional issue in an attempt to assert a manifest constitutional error that we may address for the first time on appeal. But the constitution does not require findings as to the defendant's ability to pay at the time of sentencing. *State v. Blank*, 131 Wn.2d 230, 239-42, 930 P.2d 1213 (1997). Therefore, under RAP 2.5(a), we decline to address this argument.[8]

---

[8] Morrissey suggests that this approach also raises equal protection concerns because retained counsel must advise a client in advance of fees and costs, while there is no such obligation for appointed counsel. We decline to address this issue because Morrissey fails to present any relevant argument or citation to legal authority. RAP 10.3(a)(6).

12

No. 45965-5-II

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

Johanson, C.J.

JOHANSON, C.J.

I concur:

Melnick, J.

MELNICK, J.

No. 45965-5-II

BJORGEN, J. (concurring) — For the reasons set out in my dissent in *State v. Lyle*, ___ P.3d ___, No. 46101-3-II, 2015 WL 4156773 (Wash. Ct. App. July 10, 2015), I would reach Eric Morrissey's legal financial obligations' challenge, even though he did not raise it during sentencing. However, the majority in *Lyle*, a published decision, reached a contrary conclusion. *Lyle*, ___ P.3d ___, No. 46101-3-II, 2015 WL 4156773 (Wash. Ct. App. July 10, 2015). Unless *Lyle* is overturned or its bases questioned by subsequent case law, I shall observe its result under principles of stare decisis. Therefore, I concur in this decision with the reservation here expressed.

_Bjorgen, J._
BJORGEN, J.

14